1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                   WESTERN DISTRICT OF WASHINGTON

8                            AT SEATTLE

9

10   ERASMO IGLESIAS GALVEZ,

|                                    | Case No. C06-1540-MJB |
11              Plaintiff,

|                                    | FINDINGS OF FACT AND |
12        v.                         | CONCLUSIONS OF LAW |

13   ICICLE SEAFOODS, Inc., *et al.*

14              Defendants.

15              I. JURISDICTIONAL AND PROCEDURAL HISTORY

16        Plaintiff filed his Seaman's Complaint for damages, wages and maintenance and cure

17   under Title 28 Section 1916, on October 25, 2006.  Defendant, Icicle Seafoods, Inc. filed its

18   Answer and the parties consented to the undersigned judge on December 8, 2006.  On November

19   13, 2007, a one-day bench trial was held.  After carefully reviewing the evidence presented at

20   trial, which consisted primarily of the documentary evidence and testimony from five witnesses

21   and from Plaintiff, the evidence of causation was at the center of the dispute.  The defense also

22   presented a defense of concealment through its witnesses and cross examination of Plaintiff.

23           II. STANDARD OF PROOF FOR MAINTENANCE AND CURE CLAIMS

24        The parties agree that Plaintiff bears the burden of showing by a preponderance of the

25   evidence that he is entitled to maintenance and cure by demonstrating that a) his injury occurred

26   in the ship's service, b) and that the shipowner's obligation continues until the seaman reaches

maximum cure. *The OSCEOLA,* 189 U.S. 158 (1903).  Further, they agree that any doubts or ambiguities are to be resolved in the seaman's favor.  *Farrell v. United States,* 336 U.S. 511 (1949).

## III. <u>FINDINGS OF FACT</u>

The Court finds as follows:

A.  The testimony of Lawrence Maurer, M.D.

1.    It is undisputed that Plaintiff has a hammertoe condition on the second and third toe of his left foot.

2.    Three physicians considered whether surgery was needed for the fourth toe and the other four toes were not implicated.

3.    Lawrence Maurer, M.D., a licensed podiatrist who examined Plaintiff, testified that Plaintiff had a painful first joint in his fourth toe that radiated up his foot.

4.    Dr. Maurer opined that Plaintiff's left fourth toe was a hammertoe condition and that his condition was considered moderate.

5.    As Dr. Maurer testified that with a hammertoe condition, there is no pain when one does not wear shoes, but once wearing shoes Plaintiff's hammertoe can cause pain.

6.    After reviewing a bone scan of Plaintiff's left fourth toe, Dr. Maurer opined that surgery, specifically an orthoplasty, was needed for the fourth toe to cure joint pain.

7.    Dr. Maurer's conclusion that there was a need for surgery came from medical history taken from Plaintiff that the pain was caused "When he dropped a crate on it."

8.    Dr. Maurer agreed that he had not testified as an expert before and that he did not know what is required in an expert's report.

9.    Dr. Maurer opined that Plaintiff's condition can be arthritic, but in this case it

1   was not.

2   10.   In a May 7, letter, Dr. Maurer had not decided surgery was needed, but rather

3         more bone scans or radiographic testing needed to be done.  Ex. No. 9

4   11.   Dr. Maurer's opinion was based upon a bone scan performed in March 2007.  Ex.

5         Nos.7.2, 7.3

6   12.   Later in another letter, Dr. Maurer indicated that there was a necessity for surgery,

7         though it was not mentioned in the earlier letter. Ex. No. 37.2

8   13.   Dr. Maurer gave the explanation for the differences between the two letters as

9         having written them on different dates but failing to correct the date in the second

10        letter.  Otherwise, he gave no explanation for the later addition that Plaintiff

11        needed surgery.

12  14.   The bone scan provides a diagnostic indication of damage inside the joint.

13  15.   Dr. Maurer testified that a bone scan of the fourth toe is of diagnostic assistance in

14        determining a proper course of treatment.

15  16.   Dr. Maurer explained that the bone scan showed that Plaintiff's fourth toe joint

16        caused "an increase in uptake," which meant there was a problem in the joint, and

17        thus, not merely a simple hammertoe, but rather a hammertoe with arthritic

18        condition.

19  17.   Dr. Maurer concluded that the joint had been damaged, and that the injury

20        happened on a boat.

21  18.   Dr. Maurer opined that since Plaintiff had prior surgery on his toes that he would

22        not want surgery again unless he truly needed it.

23  19.   Dr. Maurer testified that he saw no other medical reports, neither the initial report,

24        nor the reports taken by other doctors, but relied upon Plaintiff's history.

25  //

26  //

B.  Testimony of Lance Brigham, M.D.

    1.      Lance Brigham, M.D., has been board certified in Washington since 1978.

    2.      Dr. Brigham diagnosed Plaintiff with fixed claw-toes, as a preexisting condition on his fourth toe before the accident.

    3.      Dr. Brigham testified that Plaintiff's left foot is smaller than his right.

    4.      Dr. Brigham was told by Plaintiff that a platform had fallen on his foot.

    5.      Dr. Brigham testified that an examination of Plaintiff's second and third toes confirmed that Plaintiff had surgery on those specific toes.

    6.      Dr. Brigham testified that Plaintiff reported to him that his fourth toe was straight before the accident.  At the time of Dr. Brigham's examination, he asked Plaintiff to show him where on his fourth toe the platform hit, but Dr. Brigham made no notation about the location or any additional explanation from Plaintiff.

    7.      Dr. Brigham opined that Plaintiff's complaints of radiating pain were not consistent to the extent of injury Plaintiff complained of regarding the fourth toe.

    8.      Dr. Brigham testified that other medical reports he reviewed in this case did not show trauma to Plaintiff's left fourth toe.

    9.      Dr. Brigham concluded that orthoplasty would correct the claw-toe condition.

    10.     Dr. Brigham indicated some ambiguity in his opinion stating his belief that the injury that occurred on the boat was merely "a painful episode, but not a condition lasting over time."

    11.     Dr. Brigham explained that the bone scan which showed an increased uptake in the localized painful area, but that the scan did not explain what was wrong in the joint.

    12.     Dr. Brigham's opinion was that all five bones (toes) had uptake and thus an uptake in the fourth toe was not a specific finding of injury to that toe.

    13.     Looking at Ex. 9.1, a letter written by Dr. Maurer, Dr. Brigham disagreed with

1    Dr. Maurer's opinion that the platform injury manifested the fourth toe

2    hammertoe condition.  Dr. Brigham concluded from the bone scan that the

3    increased uptake in all toes caused pain to all Plaintiff's toes, thus, Plaintiff's

4    condition of hammertoe on his fourth toe was preexisting.

5    14.    Dr. Brigham opined after reading a note taken from the Pain Clinic at

6    Harborview, dated February 2, 2007, that the Harborview physician's diagnosis of

7    CRPS, was not supportable.

8    15.    Dr. Brigham gave several reasons for explaining that Plaintiff did not have the

9    characteristic symptoms of CRPS: first, pain would be accompanied by

10    significant swelling of the extremity that would require narcotic control for pain,

11    second, with CRPS, one wouldn't put weight on the foot and with atrophy the foot

12    could not move, third, with CRPS there would be nail bed changes and loss of

13    hair, fourth, CRPS would be accompanied by psychological problems of

14    depression.

15    16.    By contrast, Dr. Brigham opined that Plaintiff's left foot atrophy was due to his

16    prior accident and a condition of CRPS would have been seen on the bone scan as

17    a massive uptake as contrasted to what was described in the radiology report by

18    John R. Overbeck, M.D.  Ex. No. 7.2

19    17.    Dr. Brigham concluded that the hammertoe pain Plaintiff experienced may be

20    great, but not so much that he cannot work, as compared to Dr. Brigham's other

21    patients.

22    C. Testimony of Plaintiff

23    1.    Plaintiff testified to his prior employment on the *Bering Star*, a factory ship

24    owned by Icicle Seafoods, Inc., and that he was hired by the defendant to clean

25    salmon and other fish.

26    2.    Plaintiff worked one contract for five months and then he returned to work on a

1    different ship, the A*rctic Star,* on a second contract for the term of five months.

2    On each boat he worked 16 hours daily, seven days a week.

3.    Plaintiff testified that there had been no problems with his left foot on his first five-month contract and believed that the defendant thought of him as a good employee.

4.    On November 4, 2005, when he returned to his work station on the *Artic Star* from the restroom, the platform he had been standing on had been moved.

5.    Plaintiff testified that the platform was too heavy for him to lift alone and when he and co-workers moved the platform back to where it had been, the platform fell on his toe.

6.    Plaintiff testified that his first doctor in Seattle, Matthew La Bella did not help him.  He also explained that Harborview Medical Center referred him to the University of Washington, where he received an injection that was too painful for him, thus, he chose not to repeat the injections.

7.    Plaintiff testified that after working on the *Arctic Star*, it was eight months before he could began another job because of the pain in his foot.

8.    Plaintiff testified that he worked at Ocean Beauty Seafood ("Ocean Beauty") before coming to Icicle Seafoods, Inc.

9.    Referring to Ex. Nos.10.1 and 10.2, Plaintiff identified his handwritten application to Icicle Seafoods.  He acknowledged that it was also sworn by him as true.

10.    Plaintiff acknowledged that he knew at the time of his application that any false statements on the application could result in his dismissal.

11.    Plaintiff testified that his former employer, Ocean Beauty, was not listed on the application because he did not want to include it.

12.    Plaintiff explained that although he was asked about his work history at his

1    deposition, he did not mention working for Ocean Beauty until he was

2    specifically asked whether he had another employer in the state of Washington.

3    13.    Plaintiff admitted that he also hid his prior employment at Ocean Beauty because

4    during that employment he had run over his left foot with a pallet jack, and that

5    the accident was corroborated by an incident report.

6    14.    Plaintiff further admitted that he omitted these facts about the accident on Ocean

7    Beauty because he wanted the job at Icicle Seafoods.

8    15.    Plaintiff admitted that on the Icicle Seafoods job application he specifically stated

9    "no" when asked about prior surgeries and that he only indicated one problem

10    with his left foot, an ingrown big toe.

11    16.    Plaintiff testified that on the Icicle Seafoods application he was asked about any

12    prior car accidents and any injuries to which he also answered "no."

13    17.    Plaintiff also evaded answering the direct question on cross-examination as to

14    whether or not he concealed these facts in order to get the job at Icicle Seafoods.

15    Rather, Plaintiff explained he may have not understood English well enough at

16    the time.

17    18.    Plaintiff testified that he had been in the United States since childhood.

18    19.    On redirect examination, Plaintiff indicated he didn't mention the Ocean Beauty

19    position because he quit and he was concerned that he would get a bad reference

20    from Ocean Beauty.

21    D.  Testimony of Gary Hendrickson

22    1.    Icicle Seafoods, Inc. had an acting safety manager and first responder after

23    Plaintiff's accident who testified that he provided Plaintiff with medical care on

24    the *Arctic Star* on November 4, 2005.

25    2.    Hendrickson testified that when Plaintiff reported his toe injury, Plaintiff

26    specifically stated, "I think I need surgery."

3.    Hendrickson recalled that Plaintiff described the accident by saying, "he dropped a riser on his foot."

4.    Hendrickson examined Plaintiff's foot and found no signs of injury to Plaintiff's fourth toe and that he noticed nothing unusual in Plaintiff's gait or walking that day.

5.    Hendrickson read into the record a portion of the incident report from the Alaskan medical clinic which treated Plaintiff showing only a contusion or bruise on the left fourth toe.

E.  Testimony of Christopher Kline

1.    Christopher Kline, as Icicle's safety director, handles OSHA regulations and corporate workmen's compensation claims and provides safety records for on-board accident injuries.

2.    Mr. Kline came to the *Arctic Star* two days after Plaintiff's accident and was informed of Plaintiff's request for surgery, spoke with Plaintiff and examined him.

3.    Mr. Kline recalled that the toe was neither bruised nor disfigured.  Nor did he find any indication that Plaintiff had trouble walking, but that he did tell Plaintiff to soak his foot in Epsom salts.

4.    Mr. Kline acknowledged that accident investigations are common place together with medical clinic referrals.  In this case, he did authorize an investigation; he did not authorize a medical clinic visit.

5.    Mr. Kline saw Plaintiff on December 8, 2006, after Plaintiff was seen at a Seattle clinic, and that Plaintiff was wearing a prosthetic on his foot.

6.    Kline recalled that Plaintiff nevertheless sought to secure further employment on a different ship when he returned to work in February, after his brief visit to Mexico.

7.      Mr. Kline recalled that when Plaintiff returned, he was not re-hired because Plaintiff failed to meet Icicle's notification (of re-employment) requirements.

F. Testimony of Leaurinda Moore

1.      Icicle Seafood's Human Resources director, Leaurinda Moore, testified about Plaintiff's employment application.  Ex. Nos. 14.2-14.9 and 15

2.      Moore indicated that in making employment hiring decisions that Icicle Seafoods relies upon Plaintiff's work history, largely because of their interest in work performance, similarity of manual labor duties and an applicant's credibility.

3.      Moore did learn through the use of interviewing questions, which are intended to confirm that all an applicant's work history that Plaintiff explained that he had previously worked for Ocean Beauty, although he did not list it on his application.

4.      Moore testified that on Plaintiff's application he reported that he had not worked in a processing plant before, although Ocean Beauty is a processing company.

5.      Moore indicated that Plaintiff's use of the English language was sufficient to complete the interview, and if it had not been, she would have stopped the interview.

6.      Moore testified that Plaintiff had prior injuries that were not disclosed in his application (Ex. No. 15) and that any prior disability would be considered by Icicle Seafoods, along with the essential duties of the job.

7.      Moore explained that full disclosure of prior injuries may also include seeking medical documentation that confirms the applicant's physical limitations.

8.      Moore indicated that Plaintiff's failure to disclose prior injuries is ground for termination.

9.      Regarding payment of state workers' compensation when compared with federal maritime benefits, Moore testified that she determines the total amount of compensation owed to Plaintiff.

10. Moore indicated that Plaintiff's state compensation began November 16, 2005, as total temporary disability payments, but that starting on November 26, 2005, payments for maintenance started.

11. Moore stated that Icicle Seafoods also considered an Icicle Seafoods extension bonus for those who stayed through the end of the season and that Plaintiff received the bonus.

12. Moore confirmed that Plaintiff's Alaska clinic medical invoices were paid, with the exception of a small sum of slightly more than $9.00.

13. Moore confirmed that maintenance and cure payments were stopped on April 3, 2006, because she relied upon an opinion of an independent medical examiner, Dr. Brigham.

14. Moore testified that if Plaintiff had revealed his true medical history and prior work history, it would have resulted in a dialogue with her, but that the most important factor in any hiring decision was his dishonesty by failing to list Ocean Beauty on his job application.

15. Moore indicated that based upon Plaintiff's failure to include his prior medical problems, prior toe surgeries and his prior employment at Ocean Beauty, in combination, Icicle Foods would likely not have hired Plaintiff to work on the *Arctic Star*, but perhaps may have hired him to work at another location in Bellingham.

16. Moore testified that she was alert to the English language barrier and that had there been a problem, she would not have had him complete the application until he had a working knowledge of the English language.

17. Plaintiff received medical care from November 25, 2005 through April 3, 2006, and the medical payments stopped after Dr. Brigham's report concluded that Plaintiff had reached his maximum cure by April 3, 2006.

IV. CONCLUSIONS OF LAW

A.  Maintenance and Cure Claim

    1.    Plaintiff is not entitled to maintenance and cure because he failed to meet the burden of proof that a) his injury occurred in the ship's service, and b) that the shipowner's obligation continues until the seaman reaches maximum cure.  *The OSCEOLA,* 189 U.S. 158 (1903).

    2.    Plaintiff urges that maximum cure in this case occurs when Plaintiff received surgery on his fourth toe.  The Court disagrees.  Maximum cure was reached upon the medical conclusion that determined a preexisting injury to the fourth toe of the left foot diagnosed by Dr. Brigham.

B.     Concealment Defense

    1.    Testimony that gives rise to the Defendant's claims of concealment requires three elements: a showing of a) concealment, b) materiality, and c) a connection exists between the withheld information and the injury complained of in the instant suit.  *Quiming v. Int'l Pacific Enter., Ltd., 773 F. Supp.230* (D. Haw. 1990)(granting summary judgment).

    2.    Defendant urges Plaintiff intentionally concealed his preexisting hammertoe condition from his handwritten applications and the in-person interviews with human resources director, Leaurinda Moore.

    3.    Plaintiff admits in his court testimony that he did intentionally conceal his toe condition and the Ocean Beauty accident because he wanted to be hired for employment by Icicle Seafoods.

    4.    As a matter of law, all elements of the defense of concealment are satisfied and Plaintiff's maintenance and cure claim is defeated by Plaintiff's own words admitting his deceit and non-disclosure.

//

C.  Attorney's Fees

     1.     The defense has propounded an argument in favor of attorneys' fees, inasmuch as, they assert that Plaintiff's claim lacked merit, and that their refusal was reasonably grounded by the medical opinion of the independent medical examiner, Dr. Bingham.  Additionally, based upon their defense that Plaintiff concealed the truth of his pre-existing injury, Icicle Seafoods asserts that they be credited the costs of medical care they provided to Plaintiff.

     2.     Plaintiff has failed to persuade the court that his seamen's claim was meritorious, nor that he was entitled to compensatory damages, as stated above, intentional concealment should not be rewarded, thus an award of attorneys' fees is meritorious and shall be granted.

     4.     What is patently clear is that Plaintiff was injured while on the *Artic Star*.  The Court will not order credit for medical expenses paid by Icicle Seafoods, Inc.

Accordingly, and for the foregoing reasons, it is hereby ORDERED:

(1) Plaintiff's claims are dismissed with prejudice and judgment is granted in favor of Defendants.

(2) The Clerk of the Court is directed to enter judgment in favor of the Defendants.

DATED this 11th day of February, 2008.


MONICA J. BENTON
United States Magistrate Judge